ORIGINAL

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

- - - - - - - - - - - - - - - - x
                                :
UNITED STATES OF AMERICA        :
                                :
        - v. -                  :
                                :
SANJAY VALVANI,                 :
                                :
        Defendant.              :
                                :
- - - - - - - - - - - - - - - - x



USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #
DATE FILED: 6/14/16

SEALED INDICTMENT

16 Cr. ___

16 CRIM 412

## COUNT ONE
(Conspiracy to Convert United States Property, to Commit
Securities Fraud and to Defraud the United States)

The Grand Jury charges:

### Relevant Entities and Individuals

1.    At all times relevant to this Indictment,
Investment Advisor-A was a privately held group of affiliated
hedge funds and associated fund advisors specializing in
healthcare-related investments.  Until September 2013,
Investment Advisor-A managed six active hedge funds.  One such
fund focused on long-short equity investments in the healthcare
sector ("Fund-1").  Another fund, which operated from in or
about 2009 until on or about September 30, 2013, invested
primarily in debt instruments issued by healthcare companies
("Fund-2").  Investment Advisor-A's primary place of business
was New York, New York.

2.     At all times relevant to this Indictment, SANJAY VALVANI, the defendant, served as a partner in Investment Advisor-A and as one of Fund-1's portfolio managers, managing the specialty pharmaceuticals portfolio within Fund-1 (the "Specialty Pharmaceuticals Portfolio").  As portfolio manager, VALVANI had sole decision making authority for investments in the Specialty Pharmaceuticals Portfolio.

3.     Christopher Plaford ("Plaford") served as a partner in Investment Advisor-A and as Fund-2's portfolio manager from its inception in or about May 2009 through its liquidation in 2013.  As portfolio manager, Plaford directed the majority of Fund-2's investments.

4.     At all times relevant to this Indictment, and as set forth in Investment Advisor-A's compliance manuals, Investment Advisor-A forbid "insider trading," that is, "any employee from trading, either personally or on behalf of others, ... on material non-public information or communicating material non-public information to others in violation of the law."

5.     At all times relevant to this Indictment, the Food and Drug Administration ("FDA") was a federal agency within the U.S. Department of Health and Human Services that was responsible for protecting the public health by, among other things, ensuring that drugs intended for human use were safe and effective.  The Office of Generic Drugs ("OGD") was an office

2

within the FDA charged with, among other things, approving a pharmaceutical company's ability to sell a generic drug in the United States.

6.     The Drug Price Competition and Patent Term Restoration Act of 1984 (also known as the "Hatch Waxman Act") established the Abbreviated New Drug Application ("ANDA") process.  Under the ANDA process, a pharmaceutical company can apply to the FDA for approval to sell a generic version of a brand name drug.  Generic drug applications are termed "abbreviated" because they generally are not required to include preclinical (animal) and clinical (human) data to establish safety and effectiveness.  In many cases, the brand name drug company files a citizen petition with the FDA challenging the generic drug company's ANDA and arguing that the FDA should deny it.

7.     At all times relevant to this Indictment, the FDA's evaluation of ANDAs was confidential information.  The FDA did not disclose to the public when, if ever, an ANDA would be approved; the FDA also did not disclose to the public the status of its deliberations about an ANDA or any related citizen petitions.  The protection of this confidential information was central to one of the FDA's core missions: the efficient approval of generic drugs.

3

8.   At all times relevant to this Indictment, FDA employees were prohibited from disclosing non-public information that they learned in the course of their employment to individuals outside the FDA, unless such disclosure was authorized by law.   That prohibition recognized that the disclosure of such information could affect bond and stock markets.   The FDA's decision to approve a generic drug ANDA typically has a positive impact on the stock price of the company receiving approval, and a negative impact on the stock price of the company producing the brand name drug.

9.   At all times relevant to this Indictment, FDA employees also were subject to the Standards of Ethical Conduct for Employees of the Executive Branch, as codified in the Code of Federal Regulations, which prohibited improperly using non-public information to further private interests.

10.   From at least in or about 2005 through in or about 2011, Investment Advisor-A retained Gordon Johnston ("Johnston") as a consultant who, in exchange for a monthly consulting fee, provided "political intelligence" related to, among other things, the likelihood and timing of the FDA's approval of ANDAs and consideration of citizen petitions. Johnston primarily consulted for SANJAY VALVANI, the defendant. Investment Advisor-A paid Johnston hundreds of thousands of dollars over the course of Johnston's relationship with

4

Investment Advisor-A.  Before becoming a consultant, Johnston had served as the Deputy Director of OGD, where he was responsible for the review and approval of generic drugs.  At all times relevant to this Indictment, Johnston worked for a trade association for manufacturers and distributors of generic drugs (the "Trade Association"), in addition to serving as a consultant to Investment Advisor-A.

11.  At all times relevant to this Indictment, the "Expert Networking Firm" was a New York-based business that arranged paid consultations between financial industry clients and experts in various fields.  Investment Advisor-A paid the Expert Networking Firm fees for access to certain healthcare experts, including Johnston.  In or about 2004, the Expert Networking Firm arranged for Johnston to consult with SANJAY VALVANI, the defendant.  Shortly thereafter, in or about 2005, VALVANI requested that Johnston take his consulting work "off-line" from the Expert Networking Firm.  Johnston agreed to do so, ultimately entering into an exclusive consulting agreement with Investment Advisor-A, which limited Johnston's ability to provide information to other investment funds.

12.  At all times relevant to this Indictment, Individual-1 was a senior official at OGD.  In this position, Individual-1 had access to confidential FDA information about, among other things, the FDA's internal deliberations about the

5

timing and likelihood of the FDA's approval of generic drugs and consideration of citizen petitions. Individual-1 was subject to the FDA's confidentiality policies and owed the FDA a duty of confidentiality.

13. At all times relevant to this Indictment, Johnston and Individual-1 were friends who had a history, pattern, and practice of sharing confidences with each other relating to, among other things, their careers, families, relationships, and plans for the future. Johnston and Individual-1 frequently discussed both professional and personal matters, having had the common experience of working together at the FDA's OGD for over twelve years. For a period of time while Johnston and Individual-1 worked at the FDA together, Johnston supervised Individual-1, and Johnston was a mentor to Individual-1. Johnston and Individual-1 maintained a professional and personal relationship even after Johnston left the FDA, by virtue of, among other things, Johnston's consulting relationship with the Trade Association, which caused him to have frequent communications with Individual-1.

14. At all times relevant to this Indictment, Momenta Pharmaceuticals, Inc. ("Momenta") was a corporation headquartered in Cambridge, Massachusetts. Momenta's stock traded on the National Association of Securities Dealers

Automated Quotations Stock Market ("NASDAQ") and was listed under the ticker symbol "MNTA."

15. At all times relevant to this Indictment, Sanofi-Aventis S.A. ("Sanofi") was a corporation headquartered in France. Sanofi's stock traded on the New York Stock Exchange ("NYSE") through the issuance of American Depository Receipts ("ADRs") under the ticker symbol "SNY." Sanofi's stock also traded on the Euronext Paris stock exchange.

16. At all times relevant to this Indictment, Novartis International AG ("Novartis") was a corporation headquartered in Switzerland. Novartis's stock traded on the NYSE through the issuance of ADRs under the ticker symbol "NVS." Novartis's stock also traded on the SIX Swiss Exchange. Sandoz was Novartis's generic pharmaceuticals division.

17. At all times relevant to this Indictment, Teva Pharmaceuticals, Ltd. ("Teva") was a corporation headquartered in Israel. Teva's stock traded on NASDAQ under the ticker symbol "TEVA"; in 2012, TEVA's stock moved to the NYSE. Teva's stock also traded on the Tel Aviv Stock Exchange.

18. At all times relevant to this Indictment, Watson Pharmaceuticals, Inc. ("Watson") was a corporation headquartered in New Jersey. Watson's stock traded on the NYSE under the ticker symbol "WPI."

7

19.  At all times relevant to this Indictment, Amphastar Pharmaceuticals, Inc. ("Amphastar") was a corporation headquartered in California.  Amphastar's stock traded on NASDAQ under the ticker symbol "AMPH."

### The Scheme to Defraud

20.  From at least in or about 2005 through at least in or about January 2011, SANJAY VALVANI, the defendant, and others known and unknown, participated in a scheme to obtain and convert to their own use confidential and material non-public information from the FDA concerning, among other things, the FDA's internal deliberations regarding the approval of certain ANDAs and consideration of related citizen petitions.

21.  As a part of the scheme, Johnston improperly obtained confidential and material non-public information from Individual-1, among other FDA employees, and then provided it to SANJAY VALVANI, the defendant, who, knowing that Johnston had obtained the information improperly and in breach of a duty, used the information to purchase and sell securities in Fund-1. At times, VALVANI provided to Plaford the confidential and material non-public information obtained from Johnston, which Plaford also used to purchase and sell securities in Fund-2.

22.  As a further part of the scheme, SANJAY VALVANI, the defendant, caused Investment Advisor-A to confer a pecuniary benefit upon Johnston in the form of consulting fees in

8

exchange, in part, for the confidential and material non-public information that Johnston improperly obtained from Individual-1, among other FDA employees.

23.   Throughout the course of the scheme, SANJAY VALVANI, the defendant, communicated with Johnston over the telephone and via e-mail, among other means.

### The Enoxaparin ANDA Approval

24.   For example, at the direction of SANJAY VALVANI, the defendant, Johnston improperly obtained confidential and material non-public information concerning the FDA's approval of a generic version of an anticoagulant drug called enoxaparin, and passed this information to VALVANI.  VALVANI used this information to trade in advance of the FDA's July 23, 2010 announcement that it had approved an enoxaparin ANDA.  As a result of this trading, VALVANI reaped profits of almost $25 million for Investment Advisor-A.

25.   Beginning in the mid-1990s, Sanofi manufactured and sold enoxaparin under the brand name Lovenox.  Beginning in 2003, three ANDAs were filed with the FDA seeking approval to sell a generic version of Lovenox.  In June 2003, Teva and Amphastar (which was partnered with Watson) each filed an ANDA. In August 2005, Sandoz (which was partnered with Momenta) filed an ANDA (the "Momenta ANDA").  Shortly after Teva and Amphastar/Watson filed their ANDAs, Sanofi filed a citizen

petition with the FDA opposing the approval of a generic version

of Lovenox.  These three ANDAs were pending with the OGD for

years, during which time it was unclear whether OGD would

approve a generic version of Lovenox.

26.  Beginning in or about 2005, SANJAY VALVANI, the

defendant, tasked Johnston with gathering confidential and

material non-public information from FDA employees about the

FDA's consideration of the enoxaparin ANDAs.  VALVANI understood

that Johnston was communicating directly with OGD officials in

an effort to get information about the likelihood and timing of

any ANDA approval.  To promote Johnston's ability to obtain

confidential and material non-public information from FDA

employees, VALVANI and Johnston took steps to keep their

relationship a secret from persons outside of Investment

Advisor-A.

27.  As noted above, Individual-1 was a senior OGD

official.  In that capacity, Individual-1 participated in

internal, confidential meetings regarding the Momenta ANDA.  As

part of the ANDA review and approval process, OGD maintained an

internal document tracking the progress of ANDAs, including the

Momenta ANDA, and estimating the likelihood and timing of their

approval (the "Tracking Document").  Individual-1 had access to

the Tracking Document in the course of his employment.  The

information contained in the Tracking Document was highly

10

confidential and not intended to be disclosed to anyone outside of the FDA. Nonetheless, in conversations with Johnston, Individual-1 disclosed confidential and material non-public information about the status of the approval of a generic Lovenox ANDA, including information from the Tracking Document.

28. Johnston understood that Individual-1 expected that Johnston would maintain the confidentiality of the information that Individual-1 shared, by virtue of their relationship of trust and confidence. Nevertheless, Johnston breached his duty of trust and confidence to Individual-1 by sharing, among other things, the ANDA-related information with SANJAY VALVANI, the defendant, whom Johnston knew would use the confidential information to purchase and sell securities.

29. In or about late December 2009 or early January 2010, Johnston told SANJAY VALVANI, the defendant, in sum and substance, that the Tracking Document reflected that OGD was moving toward approval of a generic Lovenox ANDA. Based on his prior role at OGD, Johnston understood this to mean that the ANDA approval was highly likely and could occur in a matter of months, which information Johnston shared with VALVANI. VALVANI tasked Johnston with continuing to contact the FDA to obtain additional updates about its internal deliberations related to the approval of a generic Lovenox ANDA.

30.   Beginning on or about January 4, 2010, after receiving the tip from Johnston, SANJAY VALVANI, the defendant, requested that Investment Advisor-A give Johnston a raise.  In a January 6, 2010 e-mail to Investment Advisor-A's chief financial officer, VALVANI sought to justify providing a raise to Johnston by stressing how important Johnston was to VALVANI:  "[Johnston] is without question the most valuable consultant I've ever worked with and I'm pushing to reinforce the value of the relationship and encourage him to continue to go above and beyond for our team."

31.   Beginning on or about January 7, 2010, SANJAY VALVANI, the defendant, caused Fund-1 to increase its long position in Momenta by four-fold.  By on or about July 23, 2010, Fund-1 held an approximately 2,962,715-share long position in Momenta stock valued at approximately $35 million.

32.   On or about January 8, 2010, SANJAY VALVANI, the defendant, sent a weekly e-mail updating senior members of Investment Advisor-A about his investment positions.  VALVANI explained that he intended to increase his Momenta long position by 2.5 million shares based on an "increasing conviction in [the] name on higher conviction around [the] generic Lovenox opportunity."  VALVANI also wrote that his conviction in the Momenta trade was "9" out of 10.

12

33.   Beginning on or about January 14, 2010, SANJAY VALVANI, the defendant, caused Fund-1 to short Sanofi's securities.  By on or about July 23, 2010, Fund-1 held an approximately 1,320,454-share short position in Sanofi's European-traded stock and an approximately 509,854-share short position in Sanofi's ADRs, together valued at approximately $78 million.

34.   SANJAY VALVANI, the defendant, also conveyed to Plaford the information obtained from Johnston so that Plaford could execute securities trades in Fund-2.  Based in part on this information, in or around January 2010, Plaford instructed an analyst to research Sanofi credit default swaps ("CDSs") in anticipation of a generic Lovenox approval and thereafter, beginning in or about March 2010, caused Fund-2 to purchase at least five million Sanofi CDSs.  These CDSs, which were a form of insurance against the risk that Sanofi would default on its debt, stood to increase in price when a generic Lovenox ANDA was approved.

35.   On or about July 23, 2010 – approximately seven years after the first ANDA was filed – the FDA approved the Momenta ANDA (and denied Sanofi's related citizen petition). This approval was positive news for Momenta, as Momenta was the first company to receive generic Lovenox approval.  In addition, at the time it received FDA approval, Momenta had developed only

13

one other drug, which made Momenta's future financial performance highly contingent on whether Momenta received generic Lovenox approval. Accordingly, when the FDA announced its approval of the Momenta ANDA on July 23, 2010, Momenta's stock price increased by nearly 100 percent in one day. The approval of the Momenta ANDA on July 23, 2010 was negative news for Sanofi, which no longer had a monopoly on the drug. As a result, on or about July 23, 2010, the price of Sanofi's stock and ADRs declined.

36.   On or about July 23, 2010, when the FDA publicly announced that it had approved the Momenta ANDA, SANJAY VALVANI, the defendant, caused Fund-1 to sell the Momenta shares it held, yielding a profit of approximately $20 million. On or about July 27, 2010, VALVANI caused Fund-1 to close out the short position it held in Sanofi ADRs, yielding a profit of approximately $610,000. Between on or about July 27, 2010 and on or about August 27, 2010, VALVANI caused Fund-1 to close out the short position it held in Sanofi shares, yielding a profit of approximately $4 million. Thus, in total, VALVANI's trades based on confidential and material non-public information obtained from Johnston relating to the approval of a generic Lovenox ANDA yielded Fund-1 approximately $25 million in profits.

14

37.   After the FDA's announcement of its approval of the Momenta ANDA, SANJAY VALVANI, the defendant, continued to task Johnston with obtaining confidential and material non-public information about the status of the approval of additional generic Lovenox ANDAs.

38.   In or about early January 2011, SANJAY VALVANI, the defendant, called Johnston and stated, in sum and substance, that Investment Advisor-A had decided to end its relationship with Johnston in the wake of news reports of insider trading investigations.

### Statutory Allegation

39.   From at least in or about 2005 through at least in or about January 2011, in the Southern District of New York and elsewhere, SANJAY VALVANI, the defendant, and others known and unknown, willfully and knowingly combined, conspired, confederated, and agreed together and with each other to commit offenses against the United States, to wit, conversion of United States property, in violation of Title 18, United States Code, Section 641; and securities fraud, in violation of Title 15, United States Code, Sections 78j(b) and 78ff, and Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and to defraud the United States and an agency thereof, to wit, the FDA.

40. It was a part and an object of the conspiracy that SANJAY VALVANI, the defendant, and others known and unknown, knowingly would and did embezzle, steal, purloin, and convert to his use and the use of others records, vouchers, money, and things of value of the United States and a department and agency thereof, to wit, the FDA, the value of which exceeded the sum of $1000, and would and did receive, conceal, and retain the same with intent to convert it to his use and gain, knowing it to have been embezzled, stolen, purloined and converted.

41. It was further a part and an object of the conspiracy that SANJAY VALVANI, the defendant, and others known and unknown, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, would and did use and employ, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by (a) employing devices, schemes and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which

16

operated and would operate as a fraud and deceit upon other persons, in violation of Title 15, United States Code, Sections 78j(b) and 78ff.

42.    It was further a part and an object of the conspiracy that SANJAY VALVANI, the defendant, and others known and unknown, willfully and knowingly, using deceit, craft, trickery and dishonest means, would and did defraud the United States and the FDA by obtaining confidential information about the FDA's internal deliberations related to generic drug approvals, thereby impeding, impairing, defeating and obstructing the lawful function of the agency, in violation of Title 18, United States Code, Section 371.    5 C.F.R. § 2635.703(a).

Overt Acts

43.    In furtherance of the conspiracy and to effect its illegal objects, SANJAY VALVANI, the defendant, and his co-conspirators, committed the following overt acts, among others, in the Southern District of New York and elsewhere:

a.    On or about January 7, 2010, VALVANI caused Fund-1 to purchase Momenta securities.

b.    On or about January 13, 2010, VALVANI and Johnston spoke by telephone.

c.    On or about January 14, 2010, VALVANI caused Fund-1 to sell short Sanofi securities.

     d.    On or about January 22, 2010, Plaford instructed an analyst to research Sanofi CDSs in anticipation of a generic Lovenox approval.

     e.    On or about December 17, 2010, Plaford contacted Johnston about a matter pending before the FDA.

     f.    On or about January 9, 2011, Johnston requested payment from Investment Advisor-A for his FDA consulting services.

(Title 18, United States Code, Section 371.)

## COUNT TWO
(Securities Fraud - Momenta)

The Grand Jury further charges:

44.    The allegations contained in paragraphs 1 through 38 and 43 of this Indictment are repeated and realleged as though fully set forth herein.

45.    From on or about January 7, 2010 through on or about July 22, 2010, in the Southern District of New York and elsewhere, SANJAY VALVANI, the defendant, willfully and knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections

18

240.10b-5 and 240.10b5-2, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, in advance of the July 23, 2010 public announcement by the FDA of its approval of a generic Lovenox ANDA, VALVANI obtained material non-public information regarding the timing and likelihood of the FDA's approval and, based in whole or in part on that information, caused Fund-1 to execute securities transactions in Momenta stock.

(Title 15, United States Code, Sections 78j(b) & 78ff; Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2; and Title 18, United States Code, Section 2.)

### COUNT THREE
(Securities Fraud - Sanofi)

The Grand Jury further charges:

46.   The allegations contained in paragraphs 1 through 38 and 43 of this Indictment are repeated and realleged as though fully set forth herein.

47.   From on or about May 17, 2010 through on or about July 7, 2010, in the Southern District of New York and elsewhere, SANJAY VALVANI, the defendant, willfully and

19

knowingly, directly and indirectly, by use of the means and instrumentalities of interstate commerce, and of the mails, and the facilities of national securities exchanges, used and employed, in connection with the purchase and sale of securities, manipulative and deceptive devices and contrivances, in violation of Title 17, Code of Federal Regulations, Sections 240.10b-5 and 240.10b5-2, by (a) employing devices, schemes, and artifices to defraud; (b) making and causing to be made untrue statements of material fact and omitting to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and (c) engaging in acts, practices, and courses of business which operated and would operate as a fraud and deceit upon other persons, to wit, in advance of the July 23, 2010 public announcement by the FDA of its approval of a generic Lovenox ANDA, VALVANI obtained material non-public information regarding the timing and likelihood of the FDA's approval and, based in whole or in part on that information, caused Fund-1 to execute securities transactions in Sanofi ADRs.

   (Title 15, United States Code, Sections 78j(b) & 78ff;
Title 17, Code of Federal Regulations, Sections 240.10b-5 and
   240.10b5-2; and Title 18, United States Code, Section 2.)

## COUNT FOUR
(Conspiracy to Commit Wire Fraud)

The Grand Jury further charges:

48.   The allegations contained in paragraphs 1 through 38 and 43 of this Indictment are repeated and realleged as though fully set forth herein.

49.   From at least in or about 2005 through at least in or about January 2011, in the Southern District of New York and elsewhere, SANJAY VALVANI, the defendant, and others known and unknown, willfully and knowingly did combine, conspire, confederate, and agree together and with each other to commit wire fraud, in violation of Title 18, United States Code, Section 1343.

50.   It was a part and an object of the conspiracy that SANJAY VALVANI, the defendant, and others known and unknown, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, would and did transmit and cause to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, in violation of Title 18, United States Code, Section 1343.

21

(Title 18, United States Code, Section 1349.)

## COUNT FIVE
(Wire Fraud)

The Grand Jury further charges:

51.   The allegations contained in paragraphs 1 through 38 and 43 of this Indictment are repeated and realleged as though fully set forth herein.

52.   From at least in or about 2005 through in or about January 2011, in the Southern District of New York and elsewhere, SANJAY VALVANI, the defendant, willfully and knowingly, having devised and intending to devise a scheme and artifice to defraud, and for obtaining money and property by means of false and fraudulent pretenses, representations, and promises, transmitted and caused to be transmitted by means of wire, radio, and television communication in interstate and foreign commerce, writings, signs, signals, pictures, and sounds for the purpose of executing such scheme and artifice, to wit, VALVANI and others schemed to defraud the FDA of confidential information by improperly obtaining that information from Individual-1 through, among other deceptive means, the omission of material facts, and then converting that information to their own use, using cellular telephones and e-mail communications, for the purpose of executing securities transactions.

(Title 18, United States Code, Sections 1343 and 2.)

22

## FORFEITURE ALLEGATION

53. As a result of committing one or more of the offenses alleged in Counts One through Five of this Indictment, SANJAY VALVANI, the defendant, shall forfeit to the United States pursuant to Title 18, United States Code, Section 981(a)(1)(C) and Title 28, United States Code, Section 2461, any and all property, real or personal, that constitutes or is derived from proceeds traceable to the commission of the offenses alleged in Counts One through Five of this Indictment.

### Substitute Assets Provision

54. If any of the above-described forfeitable property, as a result of any act or omission of SANJAY VALVANI, the defendant,

    a.    cannot be located upon the exercise of due diligence;

    b.    has been transferred or sold to, or deposited with, a third party;

    c.    has been placed beyond the jurisdiction of the court;

    d.    has been substantially diminished in value; or

    e.    has been commingled with other property which cannot be divided without difficulty,

it is the intent of the United States, pursuant to Title 21,
United States Code, Section 853(p), and Title 28, United States
Code Section 2461, to seek forfeiture of any other property of
VALVANI up to the value of the forfeitable property described
above.

      (Title 18, United States Code, Section 981(a)(1)(C);
         Title 21, United States Code, Section 853(p);
         Title 28, United States Code, Section 2461.)

_____
FOREPERSON

_____
PREET BHARARA
United States Attorney

24

Form No. USA-33s-274 (Ed. 9-25-58)

---

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

**UNITED STATES OF AMERICA**

v.

**SANJAY VALVANI,**

**Defendant.**

---

**SEALED INDICTMENT**

16 Cr. ___

(15 U.S.C. §§ 78j(b) & 78ff; 17 C.F.R.
§§ 240.10b-5 & 240.10b5-2;
18 U.S.C. §§ 371, 641, 1343, 1349 & 2.)

---

PREET BHARARA
United States Attorney

---

Deput'ry        Foreperson

---

6/14/16 - Filed Sealed Indictment
as     a/w issued.
                J. Francis
                 U SMJ